UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SANDRA F. GRUSETH, | ) | CIV. 11-4050-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND |
| | ) | REMANDING THE DECISION OF |
| MICHAEL J. ASTRUE, | ) | COMMISSIONER |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Sandra F. Gruseth, moves for reversal of the Commissioner of Social Security's (Commissioner) decision denying her application for social security disability insurance under Title II of the Social Security Act and payment of attendant Medicare benefits under Title XVIII. The Commissioner opposes the motion. The court reverses and remands.

**PROCEDURAL HISTORY**

On March 31, 2009, Gruseth filed for Title II and Title XVIII benefits with an alleged onset date of August 1, 1969. AR 148.[1] Gruseth's date-last-insured (DLI) was March 31, 1980. AR 156.

The state agency denied Gruseth's claim on May 8, 2009. AR 62. On August 6, 2009, the state agency issued a reconsideration denial. AR 69. Gruseth requested a hearing and submitted additional evidence. AR 71. Administrative Law Judge (ALJ) Donald J. Willy held a hearing on July 12,

---

[1] All citations to "AR" refer to the appropriate page of the administrative record.

2010. AR 21. The case was continued to seek additional medical evidence. AR 25-32.

On October 21, 2010, ALJ John D. Sullivan held a hearing on Gruseth's claim. AR 34. In a written opinion, the ALJ determined that Gruseth was not disabled as of her DLI. AR 10-16. On March 15, 2011, the Appeals Council affirmed. AR 1-3.

## FACTS

Gruseth was born on December 9, 1948, and she graduated from high school in 1967. AR 41. Gruseth has also taken some banking courses. AR 41. Beginning in 1967, Gruseth worked as a deputy in the Register of Deeds office at the Brookings County Courthouse while her husband attended college in Brookings. AR 44. Gruseth worked in that position until she was diagnosed with cancer in 1969. AR 44.

Gruseth also worked full time in 1972 and part of 1973 in a bank. AR 45. She worked in 1977 and 1978, including some full-time work in 1978. AR 47. She was unable to continue working full time because she was absent so often due to health issues. AR 42. She worked a small amount in 1980. AR 47. At some point in time, Gruseth sold Avon products part time and babysat while her husband was in college. AR 44. Gruseth last worked in 1995, when she worked for about three months. AR 182. Gruseth's medical history is described herein as her medical history before her DLI and her medical history after her DLI.

2

## I.    Evidence Dated Before March 31, 1980

In August of 1969, when she was 20 years old and pregnant, Dr. Donald Breit diagnosed Gruseth with "very extensive carcinoma of the cervix extending on in to the vagina and with some fixation." AR 475. The cancer was at least stage II and possibly stage III. AR 475. Gruseth did not have a hysterectomy or surgical therapy for her cancer because the cancer was inoperable. AR 217, 475.

In lieu of surgery, Gruseth underwent cobalt and radiation therapy, including a radium implant, from August to November of 1969. AR 475. Dr. Breit administered the radiation and cobalt treatments. AR 473-75. He reported that Gruseth handled the therapies "very well." AR 473.

Dr. Breit referred Gruseth to Dr. Russell Orr to handle the complications from her pregnancy and cancer treatments. AR 473, 475. The radiation killed Gruseth's two-and-a-half-month-old baby. AR 217. The radiation also stopped Gruseth's menstrual cycle. AR 217. By February of 1970, her biopsies showed cellular abnormalities, but these abnormalities were related to the radiation therapy and not the cancer. AR 489.

Gruseth saw Dr. Orr 10 times in 1969, 15 times in 1970, 7 times in 1971, 5 times in 1972, 3 times in 1973, 5 times in 1974, 3 times in 1975, 0 times in 1976, 2 times in 1977, 2 times in 1978, 3 times in 1979, and 2 times in 1980. AR 476-84. Dr. Orr's treating notes are sparse but state that Gruseth suffered from occasional aching, nausea, tiredness, nervousness, spotting when nervous, blurry vision, pain in the legs and arms, headaches bilateral

3

with tightness, headaches with diarrhea, vaginal stricture and stenosis,[2] tightness in the vagina, and vaginal adhesions from a reaction to the radiation. AR 476-84. Gruseth received Premarin treatments[3] for her early on-set menopause. AR 217.

On June 10, 1978, Gruseth was admitted to Sioux Valley Hospital, where Dr. R. R. Seidel treated her. AR 216. Dr. Seidel noted that Gruseth suffered from migraine headaches, and myalgia, and that she had been treated for cancer. AR 216.

Dr. Seidel noted that Gruseth suffered from two types of headaches. AR 217. First, Gruseth suffered from migraine headaches for the past three to four years. AR 217. Dr. Seidel noted that the frequency of the migraines was decreasing. AR 217. The migraine headaches were severe and caused Gruseth to vomit. A R217. When she experienced a migraine, Gruseth had to lie down. AR 217. Bright lights or loud noises made the migraines worse. AR 217. Gruseth took Excedrin and pain pills prescribed by Dr. Orr to treat the migraines. AR 217.

Second, Dr. Seidel noted that Gruseth suffered from sinus headaches. AR 217. At the time of her appointment with Dr. Seidel, Gruseth's sinus

---

[2] Stenosis is "[a] stricture of any canal or orifice." *Stedman's Medical Dictionary* 1832 (28th ed. 2006). A stricture is "[a] circumscribed narrowing or stenosis of a hollow structure, usually consisting of ciatricial contracture or deposition of normal tissue." *Id.* at 1848.

[3] Premarin is a mixture of estrogen and is generally used to treat menopause's vaginal symptoms. Drugs.com, http://www.drugs.com/premarin-vaginal.html (last visited May 15, 2012).

headaches had been present for two years. AR 217. The sinus headaches manifested as a swollen feeling behind Gruseth's eyes. AR 217. She also felt pressure with those headaches. AR 217. Gruseth often treated the sinus headaches with Alka-Seltzer. AR 217. Dr. Seidel suggested that Gruseth try Novahistine or Dimetapp for her sinus headaches. AR 219.

Dr. Seidel also noted that Gruseth had suffered from muscle aches for approximately three months as of June 10, 1978. AR 217. The pain did not involve the joints but rather was a constant, steady aching. AR 217. Dr. Seidel stated that this was a "myalgia type feeling[.]" AR 219. Dr. Seidel prescribed four to six aspirins a day for the myalgia. AR 219.

Dr. Seidel further noted that Gruseth had suffered from "colitis[4] type symptoms," but she was not experiencing diarrhea at that time. AR 217. Dr. Seidel noted that Gruseth's bowel sounds were "normal in regards to frequency and pith. No abdominal bruits heard." AR 218.

On December 10, 1977, Dr. M.F. Petereit saw Gruseth after she fell down some stairs. AR 233. In determining whether Gruseth fractured or broke any bones, Dr. Petereit noted that Gruseth's "bones appear a little osteoporatic for patient's age." AR 234.

---

[4] Colitis is "[i]nflamation of the colon."*Stedman's* at 408.

## II.   Evidence After March 1, 1980[5]

After March 1, 1980, Gruseth continued to seek medical treatment for her chronic diarrhea, vaginal atrophy with associated urinary problems, colon stricture, and pelvic adhesions, which caused her abdominal pain. AR 259, 270, 440-41. Gruseth's medical treatment regarding these issues is set out in reverse chronological order according to each medical professional who saw her.

Dr. Christopher Hurley performed a colonoscopy on Gruseth on June 25, 2007. AR 273. He noted that "[i]n the region of the rectosigmoid junction there was slight stricturing of the colon and there was a somewhat fixed sensation to the distal sigmoid colon and rectosigmoid region[.]" AR 273. The biopsies from that colonoscopy were returned as benign. AR 274.

On July 22, 2009, Dr. Troy Schmidt, a gastroenterologist, evaluated Gruseth "for followup evaluation of painful defecation, loose stools, and hematochezia."[6] AR 248. Gruseth complained of continued diarrhea and "rather significant pain, and a burning sensation in the perineum and/or rectal area." AR 249. Gruseth told Dr. Schmidt that it was not uncommon for her to see blood in her stools or in the toilet water. AR 249.  Gruseth reported that

---

[5] Gruseth continued to have numerous medical conditions after her DLI. Medical evidence that does not relate to Gruseth's bowel conditions has been omitted because it is not pertinent to the issues that Gruseth raises in regard to the ALJ's decision. The court only discusses the medical records that provide detailed impressions and findings about Gruseth's bowel conditions.

[6] Hematochezia is the "[p]assage of bloody stools, in contradistinction to melena, or tarry stools." *Stedman's* at 862.

she has a bowel movement after almost every time she eats. AR 249. For example, Gruseth told Dr. Schmidt that she had recently eaten a hamburger and a baked potato at a restaurant. AR 249. She had three bowel movements before leaving the restaurant and another six bowel movements when she returned home. AR 249. While eating makes her bowel movements worse, she will have bowel movements even when she is fasting. AR 249. Gruseth reduced her oral intake of food, but she continued to gain weight. AR 249. Gruseth stated that it hurts her to sit or walk for 15-20 minutes after a bowel movement. AR 249.

Dr. Schmidt noted that Gruseth's baseline for diarrhea was five bowel movements a day but that baseline had recently increased. AR 249. Dr. Schmidt stated that Gruseth has "chronic problems with diarrhea." AR 250. He noted that, in the past, "there had been some concern that diarrhea might be related to radiation enteropathy,"[7] and that "[w]e know that she has radiation proctopathy."[8] AR 250. He opined that her pain, diarrhea, and bloody stools could be due to persistent radiation proctopathy, inflammatory bowel disease, and/or internal hemorrhoids. AR 250. Gruseth agreed to an upper endoscopy and colonoscopy at the conclusion of the visit. AR 250.

---

[7] Enteropathy describes an intestinal disease. *Stedman's* at 648.

[8] "Radiation proctopathy is a common unfortunate complication following radiation therapy of pelvic malignancies. Symptoms of chronic radiation proctopathy include haematochezia, urgency, constipation, tenesmus, diarrhea and rectal pain." J.J. Hong et al., *Review Articles: Current Therapeutic Options for Radiation Proctopathy*, Ailment Pharamacol Ther. (2001), *available at* http://www.ncbi.nlm.nih.gov/pubmed/11552895.

On August 3, 2009, Dr. Schmidt performed a colonoscopy. AR 252. He noted that Gruseth's internal hemorrhoids were "very minor." AR 253. He encountered difficulty in maneuvering the equipment through parts of Gruseth's colon, especially in the sigmoid region. *See* AR 253 (stating that Dr. Schmidt encountered "considerable resistance" in performing the procedure in the sigmoid region). Dr. Schmidt observed that "[c]olonoscopy was unusually difficult secondary to sigmoid stenosis." AR 254. He noted that "[t]he entire colonic and rectal mucosa are normal except for some granularity in the sigmoid region and some scarring in the rectum." AR 253. He found "severe sigmoid stenosis related to previous radiation therapy and cobalt therapy." AR 254. The results of the biopsies taken during the colonoscopy were either within normal limits or benign. AR 258.

During an August 17, 2009, appointment, Dr. Schmidt noted that Gruseth suffered from osteoporosis, chronic, intermittent diarrhea, and severe sigmoid stenosis related to radiation and cobalt therapies. AR 264. Regarding her diarrhea, Dr. Schmidt noted that Gruseth has to spend about half an hour on the toilet every time she has a bowel movement, and that Gruseth's diarrhea is worse when she eats beef, fresh fruits, or fresh vegetables. AR 265. Gruseth reported that she has intermittent episodes of rectal pain, but her rectal bleeding was improving. AR 265. Because she had "maximal radiation exposure for treatment of her cervical cancer," Gruseth stated that she had been advised to avoid any unnecessary radiation unless it was absolutely necessary. AR 265. Thus, she declined Dr. Schmidt's suggestion that she

8

undergo a CT enterography. AR 265. Dr. Schmidt was unsure of the reasons for her bowel issues but could not "yet exclude the possibility that some of her symptoms are related to the abnormal sigmoid anatomy." AR 265.

In the impressions section of the August 17, 2009, medical record, Dr. Schmidt noted Gruseth suffered from chronic diarrhea. AR 265. Dr. Schmidt had not yet "found any specific cause for her diarrhea." AR 265. He stated that he was "not yet convinced that treating this will bring about resolution of symptoms[.]" AR 265. Dr. Schmidt suggested that Gruseth undergo a small bowel examination. AR 265.

On August 19, 2009, Gruseth underwent a small bowel study. AR 262. The examination showed a "tiny sliding hiatal hernia" in the lower half of the esophagus. AR 262. The examination further showed a rapid small bowel transit time of 20 minutes. AR 263. The study was otherwise unremarkable. AR 263.

On September 30, 2009, Dr. Schmidt saw Gruseth and discussed the results of Gruseth's colonoscopy. AR 377. Dr. Schmidt noted that Gruseth tested positive for the helicobacter pylori[9] antibody, and he placed her on a Prevpac therapy course. AR 377. The biopsies collected during the colonoscopy were within normal limits. AR 377. Dr. Schmidt again noted that Gruseth had "[s]evere sigmoid stenosis related to previous radiation therapy and cobalt therapy." AR 377. He further noted that she might have some intestinal

---

[9] Helicobacter pylori is "a bacterial species that produces urease and causes gastritis and nearly all peptic ulcers of the stomach and duodenum." *Stedman's* at 859.

bacteria growth, but she was not receiving any treatment for this condition. AR 377. Dr. Schmidt noted that since her last visit, she had been taking the prescription drug Elavil, which was improving her symptoms. AR 378. In the impressions section of the September 30 record, Dr. Schmidt stated that he thinks Gruseth "has diarrhea predominant irritable bowel syndrome. Thus far, we have not found any other signs for inflammatory bowel disease, significant colitis and/or radiation proctopathy, malabsorptive process, etc." AR 378.

On December 8, 2009, Gruseth again saw Dr. Schmidt for a routine evaluation. AR 375. Gruseth reported that Elavil was alleviating some of her bowel issues. AR 375.

On September 25, 2009, Dr. Maria Bell, Gruseth's gynecologist, saw Gruseth. AR 356. Dr. Bell summarized Dr. Schmidt's findings that Gruseth's "sigmoid is scarred and stuck in the pelvis and she may eventually need surgery and a colostomy." AR 356. Dr. Bell noted that Gruseth has a history of "chronic diarrhea from her previous radiation." AR 358. Dr. Bell opined that Gruseth "either will have to continue to live with the chronic diarrhea or proceed with surgery." AR 358. Dr. Bell told Gruseth that "she is at risk for bowel perforation[.]" AR 358.

During a January 14, 2010, visit, Barbara Belkham, a physician assistant who works with Dr. Bell and who was responsible for coordinating Gruseth's care between the various specialists, AR 440, noted that Gruseth has "chronic diarrhea from her previous radiation." AR 418.

10

On February 2, 2010, Belkham wrote a letter in support of disability. AR 270. Belkham noted that she supported Gruseth's attempts to secure disability because "her multiple health problems are preventing her from being fully functional in any type of work environment." AR 270. Belkham stated that as a result of Gruseth's treatments for cancer, Gruseth "has developed chronic diarrhea, vaginal atrophy with associated urinary problems, sigmoid colon stricture, and generalized pelvic adhesions which cause chronic abdominal pain." AR 270. Gruseth's "[c]hronic diarrhea with associated gas and bloating . . . results in chronic abdominal pain. The sigmoid stricture may also be responsible for this pain and ultimately may need a colon resection and colostomy." AR 270. Belkham further noted that Gruseth's fibromyalgia and chronic fatigue have limited Gruseth's activities. AR 271. Belkham opined that Gruseth "cannot tolerate more than 2 hours of occupational requirements." AR 271.

Gruseth began seeing Dr. James Eckhoff in 2007 for her rheumatology issues. AR 363. On July 16, 2007, Dr. Eckhoff noted that Gruseth had a history of colitis and diarrhea as a result of her cancer treatments. AR 371. On December 31, 2009, Dr. Eckhoff's physician assistant noted that Gruseth suffers from diarrhea. AR 363. Dr. Eckhoff's physician assistant noted that the radiation "caused sigmoid colon to be very hard instead of pliable so trouble [with] diarrhea . . . . Some constipation also." AR 365.

In 2009, Dr. Orr, Gruseth's treating doctor for her cancer, explained that Gruseth was a "DES daughter," AR 238, meaning that she had exposure to

11

DES, or diethylstilbestrol when she was in the womb. AR 242.[10] In a letter dated June 21, 2009, Dr. Orr explained that the extensive radiation therapy resulted in gastrointestinal and genitourinary complications. AR 238. Dr. Orr opined that "Gruseth's general physical status is limited. She is not eligible to be considered for regular or 'typical' work obligations due to her multiple physical complications and limitations, she cannot tolerate a full-day's occupational requirements." AR 238. Dr. Orr did not provide a time frame for this opinion. AR 238.

In a letter dated August 27, 2010, Dr. Orr noted that Gruseth tried to work various jobs before 1980, but those jobs failed because "she had developed added complications of severe, sudden diarrhea plus anxiety and exhaustion[.]" AR 515. After the ALJ denied Gruseth's claims, Dr. Orr wrote a letter to Gruseth's attorney dated October 16, 2010. AR 516-17. In that letter, Dr. Orr stated that Gruseth has seen multiple doctors in various cities for treatment to no avail. AR 516. Dr. Orr opined that her health condition was "debilitating" and "[s]he has a life-long disability of health without a hope of cure!" AR 517.

---

[10] DES "is a synthetic form of the hormone estrogen that was prescribed to pregnant women between 1940 and 1971 to prevent miscarriage, premature labor, and related complications of pregnancy." *National Cancer Institute*, *Diethylstilbestrol (DES) and Cancer*, http://www.cancer.gov/cancertopics/factsheet/Risk/DES (last visited June 6, 2012). DES is linked to "increased risks of clear cell adenocarcinoma of the vagina and cervix and of breast cancer have been found for daughters of women who took DES during pregnancy[.]" *Id.* Other doctors who treated Gruseth also noted that she had been exposed to DES. *See, e.g.*, AR 358, 370, 420, 440.

In May of 2009, Dr. Kevin Whittle, a state agency physician, reviewed Gruseth's medical records. AR 60. Dr. Whittle determined that Gruseth's impairments were not severe as of her DLI. AR 60, 272.

In August of 2009, Dr. Larry Vander Woude, a state agency physician, reviewed the medical evidence. AR 61, 272. Dr. Vander Woude noted that the "available evidence is very limited[.]" AR 272. He found that there was "insufficient evidence" to assess whether Gruseth was disabled. AR 272.

## III.   Testimony

During the hearing, Gruseth testified that she suffers from various medical problems, including "constant migraine headaches, colon problems, colitis, rapid transit intestinal tract, general aching which now they say is fibromyalgia, they probably didn't have a name for it before, fatigue." AR 48. Gruseth also stated that she suffers from tremors and issues with her legs from the radiation. AR 48-49.

Gruseth testified that she suffered from migraines following the radiation treatment. AR 43. She estimated that she had two to three migraines a week. AR 43. The migraines caused Gruseth to vomit. AR 43. When she got a migraine, she would have to lay in bed with the lights out and a pillow over her head. AR 43.

Gruseth also testified about her intestinal issues. AR 48. She testified that she has "had ongoing problems with diarrhea for years" due to the damage to her intestinal tract from the radiation and cobalt treatments. AR 48. She testified that if she eats or drinks anything, the substance passes through her

13

in 10-20 minutes. AR 48. If she gets a little anxious or nervous, then the problem is even worse. AR 48. She cannot have surgery on her lower stomach because of the radiation and cobalt. AR 49. Due to her cancer treatments, Gruseth has issues regarding her ability to heal properly. AR 49. Gruseth stated that her "colon is cemented instead of pliable[.]" AR 9.

Gruseth testified that her bowel issues have remained about the same over the years. AR 49. Gruseth testified that she did not have the strength due to her migraines and fatigue to work full-time for the majority of the time period between 1969 and 1980. AR 47. Gruseth testified that she did not have significant work history after her DLI, and she did limited chores around the house. AR 50. For example, she does not do the vacuuming or lifting around the house because her neck easily goes out. AR 50. She dusts and does some cooking. AR 50.

Gruseth testified that she cannot stand for a long period of time, cannot walk down or up more than a few steps without difficulty, she is dizzy when she stands up out of a chair or gets up from a reclining position, and her medications make her feel like she is constantly drugged. AR 52-53. She is unable to garden due to allergies and cannot sew because her hands shake. AR 53. She does not have dinners with friends at her home because she cannot prepare food, lift a tray, or pour a coffeepot. AR 54. She occasionally goes out to dinner but has to either leave immediately after eating so she can use the restroom or not eat or drink at the restaurant. AR 54.

14

Gruseth testified that she has pain all the time, and she estimated that her pain is a seven or an eight on a scale of one to ten. AR 5-51. She hurts all over and feels like she has the flu. AR 51. She has been nauseous since her first cancer treatment. AR 50. The record is not clear on what medications Gruseth received before March 1980. One note from Dr. Seidel stated that Gruseth received pain medications from Dr. Orr, and she took over-the-counter medications. AR 217.

Tom Audette, a vocational expert, also testified during the hearing. AR 55. Audette testified about employers' expectations on absences, routine breaks, and rest periods. AR 56. Audette testified that most employers allow at least one absence per month. AR 56. If an employee misses more than one day a month, her job is in jeopardy. AR 56. Audette stated that employees generally receive a 15-minute morning break, a lunch break, and a 15-minute afternoon break, and if an employee exceeds those breaks, competitive employment would be eliminated. AR 57.

## ALJ DECISION

On December 3, 2010, the ALJ issued a decision denying Gruseth's application for social security benefits. AR 10. Before conducting the sequential five-step evaluation process,[11] the ALJ determined that Gruseth's

---

[11] An ALJ must follow " 'the familiar five-step process' " to determine whether an individual is disabled: "(1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." *Martise v. Astrue*, 641 F.3d 909, 921 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)); *see also* 20 C.F.R. § 416.920 (detailing the five-step process).

disability insured status lapsed after March 31, 1980, and, thus, she had to show that she was disabled before March 31, 1980.

At the first step, the ALJ determined that Gruseth met the insured status requirements on March 31, 1980. The ALJ found that Gruseth engaged in substantial gainful activity during 1972, and he found that there were continuous 12-month periods during which Gruseth did not engage in substantial gainful activity. At step two, the ALJ found that Gruseth has the medically determinable impairments of migraine headaches and status post adenocarcinoma of the cervix. The ALJ then concluded that prior to the DLI Gruseth did not have an impairment or combination of impairments that significantly limited her ability to perform basic work activities and, thus, Gruseth did not have a severe impairment or combination of impairments. Because the ALJ determined that Gruseth was not under a disability from August 1, 1969, through March 31, 1980, he did not complete steps three through five of the five-step sequential analysis.

## STANDARD OF REVIEW

An ALJ's decision must be upheld if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (reasoning that substantial evidence means "more than a mere scintilla."

16

(citations omitted)). In determining whether substantial evidence supports the ALJ's decision, the court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010) (internal citation omitted). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by substantial evidence, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are

17

reviewed de novo with deference accorded to the Commission's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

Gruseth alleges that the ALJ made five reversible errors: (1) the ALJ failed to identify a medically determinable impairment that predated the DLI; (2) the ALJ failed to develop medical evidence of health consequences of sigmoid stricture; (3) the ALJ failed to address the treating physician opinions; (4) whether the failure to consider the effect of combined impairments constituted reversible error; and (5) whether the ALJ's credibility assessment complied with SSR 96-sp and SSR 96-7p.

All five of Gruseth's issues pertain to the ALJ's assessment at step two that Gruseth does not suffer from a severe impairment. At step two of the sequential evaluation process, Gruseth must establish that she has a medically determinable physical or mental impairment or combination of impairments that is severe. 20 C.F.R. § 416.920(a)(4)(ii); *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("It is the claimant's burden to establish that [her] impairment or combination of impairments are severe." (citation omitted)).

A severe impairment must "significantly" limit the claimant's physical or mental ability to do basic work activities, 20 C.F.R. § 416.920(c), such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, understanding, remembering simple instructions, using judgment, responding appropriately to usual work situations, and dealings with changes

in a routine work setting. 20 C.F.R. § 416.921(b)(1)-(6). An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. *Id.*; 20 C.F.R. § 404.1521(a). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard[.]" *Kirby*, 500 F.3d at 708 (internal citation omitted). The sequential evaluation process ends at step two if the impairment has no more than a minimal effect on the claimant's ability to work. *Id.*

## I.     Severe Sigmoid Stenosis

Gruseth alleges that the ALJ erred at step two by not finding that her severe sigmoid stenosis[12] was a severe impairment. In support of his finding, the ALJ cited Gruseth's single medical record from Dr. Seidel. AR 14-15. On May 10, 1978, Gruseth saw Dr. Seidel for complaints of leg and arm aching and nausea. AR 217. Gruseth reported that she has a history of colitis and occasional flare ups of colitis. AR 217. She denied having constipation or diarrhea. AR 217.

Dr. Seidel, however, was not Gruseth's treating physician. Dr. Orr was Gruseth's treating physician for her cancer and cancer-related symptoms during the relevant time period. Dr. Orr's medical notes from the relevant time period are sparse. *See* AR 476-91. But Dr. Orr wrote numerous letters in 2009

---

[12] Gruseth's bowel issues have been described with various names. For simplicity, the court will use "bowel issues" or "severe sigmoid stenosis." By using these terms, the court does not intend to identify the exact name for Gruseth's condition. Instead, on remand, the ALJ should determine what bowel disorder, if any, Gruseth suffered from during the relevant time period.

describing Gruseth's medical history. Other medical records dated after the DLI similarly explain Gruseth's bowel issues.

Gruseth contends that the ALJ should have considered medical evidence dated after the DLI if the evidence related to a medical condition that existed before the DLI. The Commissioner responds that the ALJ did not err in failing to cite "severe sigmoid stricture" as a severe impairment because the medical evidence dated before her DLI does not support such a finding.

"Evidence from outside the insured period can be used in 'helping elucidate a medical condition during the time for which benefits might be rewarded.'" *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (quoting *Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998)). "If the diagnosis is based upon a 'medically accepted clinical diagnostic technique,' then it must be considered in light of the entire record to determine whether 'it establishes the existence of a physical impairment prior to' the expiration of the claimant's insured status." *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984) (quoting *Dousewicz v. Harris*, 646 F.2d 771, 774 (8th Cir. 1981)). "Retrospective medical diagnoses constitute relevant evidence of pre-expiration disability." *Jones v. Carter*, 65 F.3d 102, 104 (8th Cir. 1995) (citations omitted).

The Eighth Circuit has reasoned that an ALJ commits an error if he fails to consider evidence that is meant to fill the gaps in the claimant's medical history. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1985) (reasoning that the ALJ committed an error by failing to consider affidavits from the

claimant and his friends and family that would have filled the gaps in the claimant's medical record). The Eighth Circuit has expanded on *Basinger*:

> These findings plainly show that the ALJ did not, presumably because he believed that he could not, consider Martonik's medical records and other evidence of her condition subsequent to September 30, 1970 as support in establishing whether she had a disability entitling her to benefits under the Act. The evidence shows that Martonik suffered some disability during the period in question, that Martonik has had varying degrees of physical disability since adolescence, and that her condition has progressively worsened over time. No evidence in the record contradicts her claim that since little was known about lupus in the late 1960's the most significant medical evidence regarding her condition was assembled on successive hospitalizations occurring after September 30, 1970. The contents of Martonik's medical records for the period after September 30, 1970 are essential to a complete and accurate evaluation of her claim, as they demonstrate a series of continuous physically debilitating medical conditions which precluded her from engaging in substantial gainful employment. The ALJ's failure to consider evidence after September 30, 1970 in evaluating her condition as it existed before that date is clearly contrary to *Basinger*.

*Martonik v. Heckler*, 773 F.2d 236, 240 (8th Cir. 1985).

In a June 22, 2009, letter, Dr. Orr explained that Gruseth is a "DES daughter," meaning that she was exposed to a form of estrogen that has been linked to increased risks of cancer of the vagina and cervix. AR 238. Gruseth's other doctors have similarly noted her exposure to DES. AR 358, 370, 420, 440.

Dr. Orr stated that the radiation therapy Gruseth received to treat her cancer "resulted in gastrointestinal and genitourinary complications[.]" AR 238. In an August 27, 2010, letter, Dr. Orr again stated that the radiation therapy "later result[ed] in complications of bowel and bladder—kidney functions." AR

515. Dr. Orr did not provide a time period for when these complications arose. He did, however, state that "[b]y 1980 . . . she had developed added complications of severe, sudden diarrhea plus anxiety and exhaustion[.]" AR 515. In a letter dated October 16, 2010, Dr. Orr clarified that Gruseth's medical treatments for her cancer resulted in radiation-induced menopause. AR 516.

Additionally, various doctors' reports since 1980 have noted that Gruseth has severe sigmoid stenosis or hardening of the colon. *See, e.g.*, AR 248-50, 264-65, 270, 273, 356-58, 377-78. In 2007, Dr. Hurley performed a colonoscopy on Gruseth. AR 273. He noted that "there was slight stricturing of the colon and . . . a somewhat fixed sensation to the distal sigmoid colon and rectosigmoid region[.]" AR 273. It appears from the medical records that Gruseth then sought treatment for her bowel issues from Dr. Schmidt.

During a July 22, 2009, appointment with Dr. Schmidt, Gruseth reported painful defecation and bloody stools. AR 248. She told Dr. Schmidt that she had a bowel movement after each time she eats and sometimes when she is fasting. AR 249. She experiences pain for 15-20 minutes after each bowel movement. AR 249. On average, Gruseth had five such bowel movements a day. AR 249. Dr. Schmidt opined that Gruseth's bowel issues could be "due to persistent radiation proctopathy," or complications from radiation, including bloody stools, diarrhea, and rectal pain. AR 250.

On August 3, 2009, Dr. Schmidt performed a colonoscopy on Gruseth during which he encountered difficulty in maneuvering the equipment through

parts of Gruseth's colon, particularly in the sigmoid region. AR 253. He encountered "significant resistance" in the sigmoid region. AR 253. Dr. Schmidt found "severe sigmoid stenosis related to previous radiation therapy and cobalt therapy." AR 254.

Dr. Bell and her physician assistant Belkham similarly noted that Gruseth's "sigmoid is scarred and stuck in the pelvis" and Gruseth has "chronic diarrhea from her previous radiation." AR 356, 358. In a letter dated February 2, 2010, Belkham stated that she supported Gruseth's disability claim because she "has developed chronic diarrhea" and "sigmoid colon stricture" as a result of her cancer treatments. AR 270.

Gruseth's medical evidence dated after her DLI is useful in elucidating the extent of Gruseth's bowel issues during the period before her DLI. This medical evidence is based upon her colonoscopy, the opinion of her treating physician during the relevant time period, and other medically accepted clinical diagnostic techniques, so the ALJ should have considered all of this evidence to determine whether it helps establish that Gruseth suffered from severe sigmoid stenosis or another bowel condition prior to her DLI.

The ALJ did not state whether he considered this evidence. When an ALJ does not state in his opinion whether he considered certain evidence, then the court should remand back to the ALJ for him to review the evidence and determine whether the evidence should be accepted or rejected. *See Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995) ("The ALJ may have considered and for valid reasons rejected the retrospective diagnoses and the evidence

proffered by family members; but as he did not address these matters, we are unable to determine whether any such rejection is based on substantial evidence. . . . Accordingly, remand is necessary to fill this void in the record."); *see also* 20 C.F.R. § 404.953 ("The administrative law judge must base the decision on the preponderance of the evidence offered at the hearing or otherwise included in the record."). Thus, remand is necessary for the ALJ to consider the retrospective medical evidence relating to Gruseth's severe sigmoid stenosis.

## II.      Develop the Medical Evidence

Gruseth also asserts that the ALJ failed to develop the medical evidence to explain the health implications of sigmoid stricture. The Commissioner responds that the ALJ did not need to develop the record further because there was sufficient evidence for the ALJ to make his determination.

An ALJ must develop the medical evidence when the meaning of the evidence is not apparent to him or the medical record is not fully developed. *See* 20 C.F.R. § 404.1527(e)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s[.]"); *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) ("While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.' " (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). When a long-time treating doctor's notes are cursory, the ALJ is obligated to contact the

24

doctor to gain additional evidence and clarification. *Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003) (citing *Bowman v. Barnhart*, 310 F.3d 1080, 1095 (8th Cir. 2002)).

Gruseth's medical evidence prior to her DLI, especially Dr. Orr's treating notes, is cursory. Dr. Orr, however, offered to testify on Gruseth's behalf. AR 239, 515, 517. The ALJ's decision indicates that Dr. Orr's letters and proposed testimony and other relevant, retrospective medical evidence was not considered.

For example, on appeal, Gruseth submitted an article entitled *Bowel Obstruction After Pelvic and Abdominal Radiation Therapy: Factitial Enteritis or Recurrent Malignancy?*, by James R. Shamblin et. al., from the Mayo Clinic and Mayo Foundation of Rochester, Minn. (1964). Docket 19-1. The article noted that "[b]owel complications, usually stricture, from radiation therapy are variously cited in 1.6 to 16.9 per cent of treated patients." Docket 19-1 at 1. The article further notes that "[s]ymptoms of radiation damage to the bowel may be minimal or severe and may occur at any time from the onset of therapy to many years after the conclusion of therapy." Docket 19-1 at 3. Gruseth submitted the article as an example of a "learned treatise," to "show[] what the ALJ could have learned, had he requested clarification from a treating physician or other expert." Docket 19 at 11.

On remand, the ALJ should ensure that the relevant medical record is complete, including any articles, learned treatises, documentary records, or testimony, and discuss the relevant evidence in rendering a decision. If, after

considering the evidence, the ALJ determines that the record is not clear, then he should independently develop the record.

## III.   Treating Doctor

Gruseth also contends that the ALJ erred in not providing weight to Dr. Orr's opinions because he was her treating doctor during the relevant time period. As stated above, the ALJ only considered Dr. Orr's cursory notes for the 57 visits that Dr. Orr had with Gruseth. The ALJ did not consider Dr. Orr's subsequent letters, which expanded on Dr. Orr's treatment notes.

If a treating physician's "opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," then the ALJ "will give it controlling weight." 20 C.F.R. § 416.927(d)(2). A treating physician's opinion is generally given controlling weight, but it is not inherently entitled to it, *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006), "particularly if the treating physician evidence is itself inconsistent." *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007) (quotations and citations omitted). If the treating physician's opinion is not given controlling weight under 20 C.F.R. § 416.927(d)(2), the ALJ must weigh it considering the factors set forth in 20 C.F.R. § 416.927(d)(2)-(6). 20 C.F.R. § 416.927(d)(2).

On remand, the ALJ should consider Dr. Orr's June 21, 2009, August 27, 2010, and October 16, 2010, letters. As stated above, if necessary, the ALJ should independently develop the record by seeking additional

information from Dr. Orr or from another medical source. In reexamining the evidence, the ALJ should either give Dr. Orr's opinion controlling weight or, if the ALJ determines that Dr. Orr's opinion is not entitled to controlling weight, then the ALJ should conduct the weighing analysis set forth above.

## IV.     Combined Impairments

Gruseth contends that the ALJ failed to consider the effect of her combined impairments, which she contends is reversible error. The Commissioner responds that the ALJ properly concluded that Gruseth was not disabled prior to her DLI.

At step two, the ALJ must determine whether any single impairment *or the combination of impairments* is severe. 20 C.F.R. § 404.1520(a)(4)(ii); *Fastner v. Barnhart*, 324 F.3d 981, 984 (8th Cir. 2003) (reasoning that "step two asks whether the claimant has a medically severe impairment or combination of impairments." (citations omitted)). The ALJ did not list severe sigmoid stenosis or sigmoid stricture as an impairment and, thus, did not determine whether this condition singly or in combination with Gruseth's other medical conditions was severe. On remand, the ALJ should determine whether Gruseth's severe sigmoid stenosis singly or in combination with Gruseth's other impairments is severe.

## V.     Gruseth's Credibility

Regarding Gruseth's testimony, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the finding

that the claimant has no severe impairment or combination of impairments[.]"
AR 14. Gruseth contends that the ALJ failed to adequately consider her
credibility when she testified about her impairments. The Commissioner argues
that the ALJ correctly determined Gruseth's credibility.

In weighing a claimant's subjective complaints, the ALJ should analyze
the *Polaski* factors:

> The adjudicator must give full consideration to all of the evidence
> presented relating to subjective complaints, including the
> claimant's prior work record, and observations by third parties and
> treating and examining physicians relating to such matters as:
> 1. the claimant's daily activities; 2. the duration, frequency and
> intensity of the pain; 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also Choate v.
Barnhart*, 457 F.3d 865, 871 (8th Cir. 2006) (applying the same factors).
Additional considerations include the claimant's relevant work history and the
absence of objective medical evidence to support the severity of claimant's
symptoms. *Id.*

After considering the *Polaski* factors, the ALJ must make "express
credibility determinations[.]" *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir.
2004) (citations omitted). Inconsistencies between the claimant's subjective
complaints and the evidence as a whole may warrant an adverse credibility
finding. *See Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006). "Although
'an ALJ may not disregard [a claimant's] subjective pain allegations solely
because they are not fully supported by objective medical evidence, an ALJ is

28

entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.' " *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (alterations in original) (citing *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002)). "In rejecting a claimant's complaints of pain as not credible," an ALJ is expected "to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' " *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)).

"[T]he duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson*, 363 F.3d at 738-39. The court "will not disturb the decision of an ALJ who considers, but for good cause discredits, a claimant's complaints of disabling pain." *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (internal quotation omitted).

The ALJ found Gruseth not credible "[a]fter considering the evidence of record[.]" AR 14. But that record did not include Dr. Orr's letters and other relevant, retrospective medical evidence.[13] On remand, the ALJ should consider

---

[13] "In disability determinations, credibility assessments are in the first instances for the ALJ." *Tucker v. Heckler*, 776 F.2d 793, 796 (8th Cir. 1985) (citations omitted). Moreover, in reviewing the record for substantial evidence, the court may not make its own findings of fact, including the credibility of the claimant or other witness, by reweighing the evidence and substituting its own judgment for that of the Commissioner. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Under the circumstances of this case, where the record

all of the evidence in the record and then reassess Gruseth's credibility by applying the *Polaski* factors.

## CONCLUSION

Because the court finds that the ALJ erred at step two in not considering all of the relevant medical evidence, including the retrospective medical evidence and Dr. Orr's letters, the court remands to the ALJ for further proceedings consistent with this opinion. Accordingly, it is

ORDERED that the Commissioner of Social Security's decision denying Sandra F. Gruseth's claim for social security disability insurance under Title II of the Social Security Act and payment of attendant Medicare benefits under Title XVIII of the Act is reversed and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

Dated June 7, 2012.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

---

considered by the ALJ does not contain all of the relevant medical evidence, the court will not attempt to make credibility findings.